UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| BRIAN HERRON, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | Case No. 2:13-cv-109-JMS-WGH |
| LT. D. MEYER, | ) | |
| Defendant. | ) | |

**Entry Granting Defendant's Motion for Summary Judgment, Vacating Status Conference, and Directing Entry of Final Judgment**

For the reasons explained in this Entry, the defendant's motion for summary judgment [dkt. 63] is **granted**, on the basis of qualified immunity.

## I. Background

This action is brought pursuant to the theory recognized in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971). *Bivens* "authorizes the filing of constitutional tort suits against federal officers in much the same way that 42 U.S.C. § 1983 authorizes such suits against state officers. . . ." *King v. Federal Bureau of Prisons,* 415 F.3d 634, 636 (7th Cir. 2005).

The plaintiff is Brian Herron ("Mr. Herron"), an inmate who was in custody at the United States Penitentiary, Terre Haute, Indiana ("USP-TH"), from August 2011 until the summer of 2013. The defendant is Correctional Lt. Douglas Meyer ("Lt. Meyer").

The only claim remaining in this action is that Lt. Meyer was deliberately indifferent to Mr. Herron's safety in violation of the Eighth Amendment to the United States Constitution. Specifically, Mr. Herron alleges that Lt. Meyer moved him from a wheelchair handicapped accessible cell to a non-handicapped accessible cell even though he informed Lt. Meyer that he

could not transfer onto the toilet without the use of handrails on the wall or toilet. Several hours after being placed in the non-accessible cell, Mr. Herron fell and was injured when he attempted to use the toilet. He seeks compensatory and punitive damages.

The defendant seeks resolution of Mr. Herron's claim through the entry of summary judgment. Mr. Herron has opposed the motion for summary judgment and the defendant has replied.

## II. Summary Judgment Standard

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris,* 550 U.S. 372, 380 (2007).

## III. Discussion

### A. Undisputed Facts

On the basis of the pleadings and the portions of the expanded record that comply with the requirements of Rule 56(c)(1), construed in a manner most favorable to Mr. Herron as the non-moving party, the following facts are undisputed for purposes of the motion for summary judgment:

In 2008, Mr. Herron was involved in a fight while housed at the USP Victorville, California, and was seriously injured. He sustained head trauma which has since affected his neurological abilities and his ability to walk unassisted. As a result, during the time period at issue, he used a wheelchair and wore medical undergarments/diapers for occasional incontinence. Since the assault at Victorville, Mr. Herron has been able to walk "a little bit," while being held by physical therapists with parallel bars. Dkt 63-1; Plt's Dep. at 26. He can transfer himself from his wheelchair to his bed and to the toilet using rails, grab bars, or belts. *Id.* Mr. Herron has to get onto the toilet soon after he realizes he needs to urinate or have a bowel movement to avoid soiling himself.

*1. Mr. Herron Arrives at the USP-TH*

Mr. Herron arrived at the USP-TH on or about August 9, 2011. During his intake interview, Mr. Herron reported that he was formerly a member of a gang. Mr. Herron also reported that he was a "CIMS" case. The Central Inmate Monitoring System ("CIMS") is a method for the Bureau of Prisons ("BOP") to monitor and control the transfer, temporary release, and participation in community activities of inmates who pose special management considerations. CIMS inmates may include persons whose incarceration generates public notoriety, individuals who have cooperated with law enforcement authorities, inmates who have made threats against government officials,

and inmates identified as gang members. Mr. Herron's prison records also reflected that he was to be separated from several other inmates for security reasons.

2. *Mr. Herron Requests Protective Custody and Goes to the Special Housing Unit*

In early December 2011, Mr. Herron's cellmate in general population told him that "[t]hey're coming in to get you at lunchtime today" and "[t]hey're gonna get you hard." Dkt. 63-1, Plt's Dep. at 24. He was told that he was going to get hurt if he did not go to the Special Housing Unit ("SHU"). *Id.* at 23. Mr. Herron went to the lieutenant's office and requested protective custody, which was granted. He was placed in the SHU in a handicapped wheelchair accessible cell. For the first few days in the SHU, Mr. Herron was housed alone so that Special Investigative Services ("SIS") could investigate his case and determine appropriate placement or separation from other inmates. According to Mr. Herron, other inmates mistakenly believed that he was a sex offender and therefore targeted him for violence because he may have been improperly classified as a "Walsh Act" offender.

The SHU is a busy and very staff intensive environment, meaning that the staff have to provide inmates with most services, including meals and medication, because inmates are confined to their cells 23 hours a day. In December 2011, the SHU had very limited bed space and fewer than eight wheelchair accessible cells. Wheelchair accessible cells are slightly larger than regular cells and have rails. Due to the large population at the USP-TH and the relative aging prison population, it is not uncommon for inmates in wheelchairs to be housed in non-wheelchair accessible cells. There is no BOP policy requiring that inmates with disabilities or inmates using a wheelchair in the SHU be housed in a wheelchair accessible cell.

Mr. Herron was eventually placed with a cellmate, and in mid-December, he began having problems with this cellmate. The cellmate threatened Mr. Herron and then later choked and

punched him. The cellmate was taken to another cell. The assault by his cellmate prompted another SIS investigation and Mr. Herron was again alone in his cell for approximately one week.

3. *Lt. Meyer Attempts to Place Another Inmate In the Cell*

On December 28, 2011, Mr. Herron was housed alone in the lower B range of the SHU in a wheelchair accessible cell. Sometime that afternoon, Lt. Meyer came to Mr. Herron's cell and attempted to place another inmate in the cell with Mr. Herron. When he arrived at the cell, the inmate was wearing a paper shirt and told Mr. Herron that he had been "four pointed," *i.e.,* placed in restraints, before being brought to the cell for "beating up my last cellie." Dkt. 63-1, Plt's Dep. at 32. Mr. Herron objected to being housed in the same cell with this inmate because he feared the other inmate would assault him, too. Then Lt. Meyer said, "So you all can't live together?" The other inmate said "no, …we're not living together." *Id.*

A short time later, Lt. Meyer entered Mr. Herron's cell and said "don't you have a Walsh Act assignment? We didn't put it on you here at Terre Haute, so quit filing." *Id.* at 34. Mr. Herron said he filed a BP-9 because he wanted the Walsh Act taken off his record. Lt. Meyer then said, "you are not going to sit in my SHU living high on the hog. I have something in store for you." Dkt. 80-4, Plt's Declaration, ¶ 5; Dkt. 63-1, Plt's Dep. at 34-35.

4. *Lt. Meyer Temporarily Places Mr. Herron In Another Cell*

Lt. Meyer removed Mr. Herron from his cell, in his wheelchair, and they exited the range. Shortly thereafter, SHU officials returned the inmate with the paper clothing to the cell Mr. Herron had just left. It was Lt. Meyer's practice, when one inmate objected to being housed with another, to remove the inmate who is already in the cell rather than the inmate being placed in the cell because to do otherwise would essentially allow inmates to "hold" the cell for themselves or dictate

who their cellmates will or will not be. The practice of "holding" a cell creates a security issue for inmates and staff.

Mr. Herron was first taken to a holding cell outside of Lt. Meyer's office for fifteen or twenty minutes while medications were distributed to the SHU inmates. Lt. Meyer had to find another spot for Mr. Herron fairly quickly in order to continue to operate the SHU. Although Lt. Meyer was not aware of specific information at that time about Mr. Herron's CIMS status, separatees or current or prior gang affiliation, Lt. Meyer was generally aware that Mr. Herron needed to be separated from certain inmates or groups of inmates for safety reasons and that he was an inmate who was difficult to place. Lt. Meyer did not have time to stop and review Mr. Herron's records to determine who within the SHU he could be placed with and who he could not be placed with. At that time, other inmates were housed in all of the other handicapped or wheelchair accessible cells. Therefore, Lt. Meyer placed Mr. Herron alone in an empty cell, A-216, temporarily, until staff could find him a more permanent cell that met his needs. This occurred sometime between 12:30 and 1:30 p.m. Cell A-216 was a "dry" cell or a "hard cell," meaning it did not have a shower in it. It had a concrete bed and regular toilet.

What was said at the time Mr. Herron was taken to cell A-216 is disputed. Lt. Meyer states under penalty of perjury that Mr. Herron "voiced no objections or concerns" to him or any other staff member. Mr. Herron stated during his deposition that when he saw the dry cell and saw how small it was and that it was not handicapped accessible, he asked why he was being placed there. Dkt. 63-1, Plt's Dep. at 51. He said there was no top rail or ladder or anything for him to grab to get onto the bed. *Id.* at 52. He said he needed a shower to clean himself if he soiled himself because he was incontinent. *Id.* at 51. He asked how he was supposed to use the toilet because there were no handrails. In his sworn declaration, Mr. Herron also asserts that he told Lt. Meyer that he needed

a washcloth and new undergarments to clean himself. Dkt. 80-4, Plt's Declaration at ¶ 7. As noted, Mr. Herron's statements are credited for purposes of the motion for summary judgment.

Mr. Herron states in his declaration that Lt. Meyer told him that A-216 would be his cell for the next couple of days or so and not to hit the duress button unless it was a life-threatening situation. *Id.* Shortly after Mr. Herron was placed in the dry holding cell, Lt. Meyer's shift ended, and the oncoming staff were notified of the status of SHU operations, including Mr. Herron.

A short time after Lt. Meyer left his cell, Mr. Herron asked SHU staff to assist him with transferring from his wheelchair to the toilet and the officers said they could not come into the cell to assist him but they would notify a lieutenant. Mr. Herron waited as long as he could but when help did not arrive, he attempted to transfer from his wheelchair to the toilet but fell and hit his face and head, knocking him unconscious and causing a laceration and swelling to his right forehead. He was found on the floor and seen by prison medical staff at approximately 6:10 p.m. He was then transferred to Union Hospital by ambulance for evaluation. Lt. Meyer was not present at the institution when Mr. Herron fell.

### B. Eighth Amendment Standards

At all times relevant to Mr. Herron's claims, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety

of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment inadequate prison conditions claim, a plaintiff must demonstrate two elements: (1) the conditions were objectively sufficiently serious resulting in the denial of the minimal civilized measure of life's necessities, and (2) deliberate indifference by the prison officials to that condition. *Id.* at 837; *Townsend v. Fuchs,* 522 F.3d 765, 773 (7th Cir. 2008); *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014). To be "sufficiently serious," a prisoner must show that conditions were more than uncomfortable and must rise to the level of "posing a substantial risk of serious harm" to his health or safety. *Farmer,* 511 U.S. at 834.

The Eighth Amendment "can only be violated through deliberate action or inaction - mere negligence is not 'punishment.'" *Olson v. Morgan,* 750 F.3d 708, 713 (7th Cir. 2014). "Even gross negligence is insufficient to impose constitutional liability…." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013). Deliberate indifference is "essentially a criminal recklessness standard, that is, ignoring a known risk." *Id*. (internal quotation omitted). Deliberate indifference "means that the official knew that the inmate faced a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it." *Townsend,* 522 F.3d at 773. It is not only the severity of the condition, but the duration of the condition which determines whether the Constitution has been violated. *Dixon v. Godinez,* 114 F.3d 640, 643 (7th Cir. 1997). "[A] short-term deprivation is less serious for Eighth Amendment purposes than a long-term one." *Stephens v. Cottey,* 2005 WL 1971700, 145 Fed.Appx. 179, 181 (7th Cir. Aug. 17, 2005) (citing *Tesch v. County of Green Lake,* 157 F.3d 465, 476 (7th Cir. 1998)).

Although "[a]dequate…facilities to wash and use the toilet are among the minimal civilized measure of life's necessities that must be afforded prisoners," *Jaros v. Ill. Dept. of Corr.,* 684 F3d

667, 670 (7th Cir. 2012) (internal quotation omitted), the inquiry does not stop there. "An inquiry into conditions of confinement by necessity relies on the particular facts of each situation; the circumstances, nature, and duration of the challenged conditions must be carefully considered." *DeSpain v. Uphoff,* 264 F.3d 965, 974 (10th Cir. 2001) (internal quotation omitted). "[T]he length of exposure to the conditions is often of prime importance." *Id.* (holding that exposure to human waste for 36 hours constituted a sufficiently serious deprivation under the Eighth Amendment when lack of access to working toilets led to urine and feces in standing water and odor of an inmate's own accumulated urine); *see also Johnson v. Pelker,* 891 F.2d 136, 139 (7th Cir. 1989) (three days in a segregated cell with feces smeared on walls and without running water stated a claim that the conditions fell below the civilized standards of humanity and decency ensured by the Eighth Amendment).

### C. Qualified Immunity

Lt. Meyer argues that he is entitled to qualified immunity. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lane v. Franks,* 134 S.Ct. 2369, 2381 (2014) (internal quotation omitted). Courts cannot award damages against a law enforcement official "unless the official violated a statutory or constitutional right and the right was clearly established at the time of the challenged conduct." *Id.* Qualified immunity can shield an officer from civil liability "if he can demonstrate that he was performing a discretionary function and that a reasonable law enforcement officer would have believed that, at the time he acted, his actions were within the bounds of the law." *Belcher v. Norton,* 497 F.3d 742, 749 (7th Cir. 2007). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* (internal quotation omitted).

The applicability of qualified immunity is determined by a two-part inquiry established in *Saucier v. Katz*, 533 U.S. 194 (2001). First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id*. at 201. Second, was the right at issue "clearly established" at the time of the officer's alleged misconduct? *Id*. Once the defendant asserts the qualified immunity defense, it is the plaintiff's burden to establish the violation of a protected right and that the right was clearly established at the time of the alleged misconduct. *Mordi v. Zeigler,* 770 F.3d 1161, 1163-64 (7th Cir. 2014).

The court need not resolve the two inquiries in a sequential fashion, and is free to address the second inquiry before the first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). To be "clearly established," the law must be "clear in relation to the specific facts confronting the public official when he acted." *Volkman v. Ryker,* 736 F.3d 1084, 1090 (7th Cir. 2013) (internal quotation omitted). A plaintiff may defeat a qualified immunity defense "either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon County, Ill.,* 705 F.3d 706, 723-24 (7th Cir. 2013).

Stated another way, the relevant question for purposes of qualified immunity is this: Could Lt. Meyer reasonably have believed that he could place Mr. Herron in the non-accessible cell for up to a couple of days without subjecting him to a risk of serious harm? *See e.g., Lane*, 134 S.Ct. at 2381 (discussing qualified immunity). If the answer is "yes," then Lt Meyer is entitled to qualified immunity.

Mr. Herron does not contend, nor could he persuasively, that it is a *per se* violation of the Constitution to place a wheelchair bound inmate temporarily in a non-handicapped accessible cell. In *Simmons v. Cook,* 154 F.3d 805 (8th Cir. 1998), cited by Mr. Herron, wheelchair bound inmates were placed in maximum security cells in which their wheelchairs could not fit through the door and could not reach the food tray slot for a period of four meals, 32 hours. The inmates were also unable to have a bowel movement because there were no hand rails and they were provided no assistance in reaching the toilet. *Id.* at 808. The district court and Eighth Circuit found that under these circumstances, the prison staff defendants who placed the plaintiffs in those cells violated the Eighth Amendment. *Id.* Here, Mr. Herron was not provided assistance in using the toilet for a maximum of 5½ hours. In *LaFaut v. Smith,* 834 F.2d 389 (4th Cir. 1987), cited by Mr. Herron, the prevailing paraplegic prisoner plaintiff was confined for almost eight months in a cell that had no handicap modifications, including having inadequate toilet facilities. The time period at issue in that case, however, far exceeded that in Mr. Herron's case. Mr. Herron has not presented a closely analogous case resulting in a constitutional violation.

Lt. Meyer cites *Tesch v. City of Green Lake,* 157 F.3d 465 (7th Cir. 1998) as a case which concluded that jailers did not violate a wheelchair-scooter bound arrestee's right to substantive due process by detaining him unattended for two nights in a cell that, although it was wheelchair accessible, was equipped with a toilet and sink that he struggled to use without assistance, a shower he could not use, and a bed that he could not reach. The *Tesch* Court found that the limited access problems were not obvious to jail officers before the arrestee was placed in the cell. *Id.* at 476. Therefore, because there was no evidence that the jail officers' placement of the arrestee in the cell was an act so dangerous that would permit the inference of knowledge and deliberate indifference to his basic human needs, summary judgment was appropriate. *Id.*

Lt. Meyer also cites *Crowder v. True,* 74 F.3d 812 (7th Cir. 1996). In *Crowder,* a paraplegic and wheelchair bound inmate was placed in administrative detention for three months. He alleged that his wheelchair did not fit through the cell doors, and he was denied physical therapy sessions, exercise and recreation, and proper hygienic care. Because he did not allege that the defendants were aware that a substantial risk of serious harm existed, the District Court's dismissal of his Eighth Amendment claims were affirmed. *Id.* at 815.

A reasonable factfinder could conclude that Lt. Meyer's "practice" when one inmate objected to being housed with another, to remove the inmate who is already in the cell, while reasonable in the abstract, should not have been applied in this instance, when so few wheelchair accessible cells were available. It was not unreasonable for Mr. Herron to object to being housed with an inmate who had just beat up his prior cellmate. Lt. Meyer arguably created the problem by not bending his policy and thereby moving Mr. Herron from a wheelchair accessible cell to a non-accessible cell. Mr. Herron was not able to walk or transfer to the toilet by himself. Nonetheless, although a reasonable officer would have known that Mr. Herron could not reach the toilet without assistance, there is no evidence that Lt. Meyer knew that Mr. Herron would try to transfer to the toilet without assistance and that by making such an attempt, he would face a risk of serious injury. A reasonable officer could have believed that while in cell A216 in the SHU, Mr. Herron would have been provided adequate assistance to transfer to the toilet when needed. To answer the question posed above, Lt. Meyer could have reasonably believed that he could place Mr. Herron in the non-wheelchair accessible cell for up to a couple of days without subjecting him to a risk of serious harm.

In sum, Seventh Circuit precedent did not put Lt. Meyer on notice that his cell placement of Mr. Herron would be clearly unlawful. Binding precedent did not create a clearly established

right in accordance with the Eighth Amendment under these specific circumstances. Therefore, even if there were a genuine issue of fact as to whether Mr. Herron's Eighth Amendment rights had been violated, a question the Court need to decide, Lt. Meyer is entitled to qualified immunity. Summary judgment based on qualified immunity is therefore appropriate. *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

### IV. Conclusion

Lt. Meyer is entitled to summary judgment as a matter of law on the basis of qualified immunity. Lt. Meyer's motion for summary judgment [dkt. 63] is **GRANTED.** Judgment consistent with this Entry and with the Entry of May 14, 2013, shall now issue.

The status conference set for March 20, 2015, is **VACATED**.

**IT IS SO ORDERED.**

Date: 03/09/2015

*signature*

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

Brian Herron, 07930-033, Tucson United States Penitentiary, Inmate Mail/Parcels, P.O. Box 24550, Tucson, AZ 85734

Electronically registered counsel

Magistrate Judge William G. Hussmann, Jr.